IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Alexandria Division

| | |
|---|---|
| FLORET IKOME, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:22-cv-1004 (RDA/WEF) |
| | ) |
| GENERAL DYNAMICS INFORMATION | ) |
| TECHNOLOGY, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

This matter comes before the Court on Defendant General Dynamics Information Technology, Inc.'s Motion to Dismiss (Dkt. 14). The Court has dispensed with oral argument as it would not aid in the decisional process. Fed. R. Civ. P. 78(b); Local Civil Rule 7(J). This matter has been fully briefed and is now ripe for disposition. Considering Defendant's Memorandum in Support of its Motion to Dismiss (Dkt. 14-1), Plaintiff's Opposition (Dkt. 20), and Defendant's Reply (Dkt. 21), the Court GRANTS the Motion to Dismiss for the reasons that follow.

I. BACKGROUND

A. Factual Background[1]

Defendant General Dynamics Information Technology, Inc. ("Defendant" or "General Dynamics") is a Virginia corporation that provides information technology services to federal agencies. Dkt. 1 ¶ 10. Plaintiff Floret Ikome ("Plaintiff") joined Defendant's predecessor, SRA International, Inc. ("SRA"), as a Senior Director for Strategic Initiatives on July 1, 2015. *Id.* ¶ 11.

---

[1] For purposes of considering the instant Motion to Dismiss, the Court accepts all facts contained within the Complaint as true, as it must at the motion-to-dismiss stage. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

1

Previously, Plaintiff held senior management roles with other large IT services contractors, including Unisys. *Id.* ¶ 12. Plaintiff's working relationship with SRA started in around March 20, 2015, when he began to serve, on loan from subcontractor Unisys, as the Operations Manager on a contract that SRA had with the Federal Energy and Regulatory Commission ("FERC"). *Id.* ¶ 13. Eric Toliver was the Program Manager on that FERC contract. *Id.* Plaintiff then joined SRA as a Senior Director for Strategic Initiatives and remained in that role from July 2015 until March 2016. *Id.* ¶ 14. Meanwhile, SRA merged with one of its competitors on November 30, 2015, thus forming CSRA, LLC ("CSRA"). *Id.* ¶ 15. As a result, Plaintiff became an employee of CSRA. *Id.*

At the FERC's request, CSRA Vice President of Science and Engineering, Kevin Connell, asked Plaintiff to take over the FERC contract as Program Manager on an emergency basis in order to "bail out" CSRA from a "threatened default." *Id.* ¶ 16. Plaintiff agreed to assume that role. *Id.* ¶ 17. Plaintiff alleges that he "received high marks" from FERC officials as well as his CSRA superiors for his efforts on the FERC contract. *Id.* ¶ 19.

On December 30, 2016, Connell asked Plaintiff to serve as the Program Manager for CSRA's bid on an EPA "infrastructure support and application hosting contract" ("Infrastructure Contract"). *Id.* ¶ 20. Plaintiff accepted and agreed to move to the Research Triangle Park ("RTP") area of North Carolina in order to serve as the Program Manager if CSRA was awarded the Infrastructure Contract. *Id.* ¶ 21. Plaintiff signed a letter of commitment to serve as the Program Manager in the RTP area, which CSRA submitted with its bid. *Id.* ¶ 22. Plaintiff worked full-time on the "capture team" and allegedly played an integral role in formulating CSRA's successful bid on the Infrastructure Contract. *Id.* ¶ 23. During his February 9, 2017 oral presentation to the EPA and the General Services Administration ("FEDSIM"), EPA officials asked Plaintiff to affirm

2

that he would relocate to the RTP area if CSRA was awarded the Infrastructure Contract, and he assured them that he would. *Id.* ¶ 24.

At the same time that it was preparing the Infrastructure Contract bid, CSRA was working on a bid for the EPA "end-user services contract" ("EUS Contract") and chose Toliver as the Program Manager on that contract bid. *Id.* ¶ 25. On March 30, 2017, the EPA announced the award of the $267 Million Infrastructure Contract to CSRA and the EUS Contract to a competing bidder. *Id.* ¶ 26. Plaintiff alleges that the strengths and weaknesses of Plaintiff and Toliver as proposed Program Managers were a major consideration in the Agency's decision to award the Infrastructure Contract to CSRA, with Plaintiff as the Program Manager, and not award the EUS Contract to CSRA, with Toliver as the Program Manager. *Id.* ¶ 27.

Plaintiff further alleges that, as soon as CSRA learned that it lost the EUS Contract bid, the company decided to replace Plaintiff with Toliver as the Program Manager on the Infrastructure Contract, but intentionally withheld this information from the Government for several weeks. *Id.* ¶ 28. On April 13, 2017, Connell made the following report to Paul Nedzbala, the Executive Vice President of CSRA's Health and Civil Group: "We're not going to do anything beyond discussions with [Plaintiff] and [Toliver] until next week, after the protest period has well and verily drawn to a satisfying close, then we'll socialize informally with the EPA decision makers, then move toward a Key Personnel change." *Id.* ¶ 29. On April 12, 2017, CSRA Environmental Programs Account Manager Bill Balcke informed Plaintiff that Toliver would take his place as the Program Manager on the Infrastructure Contract and assured him that he would be placed on another contract. *Id.* ¶ 30.

Plaintiff claims that he complained, first internally, and later, to EPA and FEDSIM officials, about the purported "bait and switch" of Program Managers. *Id.* ¶ 32. Plaintiff further

3

asserts that, in the aftermath of him making these internal and external complaints, CSRA provided him with insufficient time to secure another position at the company and directed the employees who would be in a position to help him in his search not to communicate with him. *Id.* ¶¶ 40-45. Finally, Plaintiff alleges that, after failing to assign him to another contract, CSRA terminated his employment on June 30, 2017. *Id.* ¶ 46. Later, in 2018, General Dynamics purchased CSRA.

### B. Procedural Background

#### 1. *Ikome I*

Notably, the instant action is the second lawsuit Plaintiff has filed related to the aforementioned events. Plaintiff originally brought a complaint against Defendant's predecessor, CSRA, on October 2, 2017, in the Circuit Court for Montgomery County, Maryland, which CSRA subsequently removed to the U.S. District Court for the District of Maryland. *See Ikome v. CSRA, LLC*, No. 8:17-cv-3407 (D. Md.) ("*Ikome I*"), Dkt. Nos. 2 (*Ikome I* Complaint), 1 (Notice of Removal).[2]

In that lawsuit, Plaintiff alleged (1) discrimination on the basis of color and national origin in violation of the Montgomery County Human Rights Act; (2) unlawful retaliation for engaging in protected activity in violation of Montgomery County Code; and (3) violation of the Maryland Wage Payment and Collection Law for failing to pay him a bonus earned as a result of securing the Infrastructure Contract with the EPA. *Id.*, Dkt. 2. (*Ikome I* Complaint). The relevant facts of Plaintiff's original lawsuit mirror those alleged in the instant action. Plaintiff alleged that he successfully worked on a bid for CSRA to secure a contract with the EPA, but that shortly after the contract was awarded to CSRA, the company notified Plaintiff that Toliver would be replacing

---

[2] The Court takes judicial notice of the filings from *Ikome I*. *See Philips v. Pitt Ctny. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (holding that courts "may properly take judicial notice of matters of public record").

him as the Program Manager on the contract. *Id.* at ¶¶ 10-15. However, in the original suit, Plaintiff pursued a different theory of liability than he does in the case at bar, alleging that CSRA replaced him with Toliver as Program Manager on the Infrastructure Contract on the basis of Plaintiff's skin color and national origin, and then terminated him in retaliation for the filing of a complaint with the Montgomery County Office of Human Rights. *Id.* at ¶¶ 17-18, 20-40.

On August 31, 2018, CSRA filed a motion for summary judgment, *id.*, Dkt. 44, which the district court granted in part with respect to Plaintiff's retaliation and pay claims and denied in part with respect to the discrimination claim, *id.*, Dkt. 53. The parties subsequently went to trial on Plaintiff's remaining discrimination claim, and the jury returned a verdict in favor of CSRA and against Plaintiff. *Id.*, Dkt. 147 (Order of Judgment). The district court entered final judgment as to all of Plaintiff's claims on December 15, 2021. *Id.* Plaintiff did not appeal the jury's verdict.

## 2. *Ikome II*

Plaintiff filed a complaint with the Office of Inspector General ("OIG") on August 13, 2019. Dkt. 1 ¶ 3. Plaintiff then agreed to the OIG's request to extend the 180-day deadline for the OIG to complete its investigation and submit a report of its findings by an additional 180 days. *Id.* ¶ 4. On September 6, 2022, Plaintiff filed a single-count Complaint in this Court against Defendant, alleging retaliation in violation of 41 U.S.C. § 4712, which protects federal contractor whistleblowers. Dkt. 1. Defendant subsequently filed the instant Motion to Dismiss ("Motion") on January 13, 2023, Dkt. 14, along with a Memorandum in Support thereof, Dkt. 14-1, moving the Court to dismiss the Complaint pursuant to the doctrine of *res judicata*, or, in the alternative, for failure to state a claim. On February 10, 2023, Plaintiff filed his Opposition to Defendant's Motion, Dkt. 20, and on February 16, 2023, Defendant filed a Reply in support of its Motion, Dkt. 21.

## II.  STANDARD OF REVIEW

In order to survive a motion to dismiss brought under Federal Rule of Civil Procedure 12(b)(6), a complaint must set forth "a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Twombly*, 550 U.S. at 556); *see also Goldfarb v. Mayor & City Council of Baltimore*, 791 F.3d 500, 508 (4th Cir. 2015) ("[T]he reviewing court must determine whether the complaint alleges sufficient facts 'to raise a right to relief above the speculative level.'" (quoting *Twombly*, 550 U.S. at 555)).

In reviewing a Rule 12(b)(6) motion, the Court "must accept as true all of the factual allegations contained in the complaint," drawing "all reasonable inferences" in the plaintiff's favor.  *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 440 (4th Cir. 2011) (citations omitted).  To be sure, "the [C]ourt 'need not accept the [plaintiff's] legal conclusions drawn from the facts,' nor need it 'accept as true unwarranted inferences, unreasonable conclusions, or arguments.'"  *Wahi v. Charleston Area Med. Ctr., Inc.*, 562 F.3d 599, 616 n.26 (4th Cir. 2009) (quoting *Kloth v. Microsoft Corp.*, 444 F.3d 312, 319 (4th Cir. 2006)).  Generally, the Court may not look beyond the four corners of the complaint in evaluating a Rule 12(b)(6) motion.  *See Goldfarb*, 791 F.3d at 508 ("Under narrow circumstances, a court may rely on extrinsic materials to determine a motion to dismiss without converting the proceeding into a motion for summary judgment.").

III.  ANALYSIS

Defendant first seeks to dismiss Plaintiff's Complaint on the ground that Plaintiff's 41 U.S.C. § 4712 retaliation claim is precluded.  In the alternative, Defendant urges the Court to dismiss the Complaint for failure to state a § 4712 retaliation claim.[3]

Although claim preclusion is an affirmative defense, a defendant may raise it on a Rule 12(b)(6) motion to dismiss if the defense raises no disputed issues of fact.  *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000); *Thomas v. Consolidation Coal Co.*, 380 F.2d 69, 75 (4th Cir. 1967).  Rooted in *res judicata* principles (which typically deal with issue preclusion rather than claim preclusion), the doctrine of claim preclusion "bars further claims by parties or their privies based on the same cause of action" when there has been a "final judgment on the merits" in an earlier suit.  *Harnett v. Billman*, 800 F.2d 1308, 1312 (4th Cir. 1986) (quoting *Montana v. United States*, 440 U.S. 147, 153 (1979)).  Requiring a final judgment on the merits "precludes the parties or their privies from relitigating issues that were or could have been raised in that action." *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981).  "The preclusive effect of a federal-court judgment is determined by federal common law."  *Taylor v. Sturgell*, 553 U.S. 880, 891, (2008) (citing *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 507-08 (2001)). This Court looks to three elements when deciding whether claim preclusion applies, asking whether there is: "(1) a final judgment on the merits in a prior suit; (2) an identity of the cause of action in both the earlier and the later suit; and (3) an identity of parties or their privies in the two suits."  *Providence Hall Assocs. Ltd. P'ship v. Wells Fargo Bank, N.A.*, 816 F.3d 273, 276 (4th Cir. 2016) (quoting *Grausz v. Englander*, 321 F.3d 467, 473 (4th Cir. 2003)).  Ultimately, claim

---

[3] Because this Court agrees with Defendant that Plaintiff's 41 U.S.C. § 4712 retaliation claim is precluded, it declines to reach the question of whether the Complaint fails to state a claim.

preclusion promotes "[j]udicial efficiency and finality" of decisions. *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d 322, 325 (4th Cir. 2004).

In the instant case, Plaintiff does not dispute that there was a final judgment on the merits in *Ikome I* or that there is an identity of parties or their privies in the two suits. However, Plaintiff does contest that both suits are based on the same cause of action. Further, Plaintiff argues that even if the three-pronged test were satisfied, his Complaint is not barred by claim preclusion because his retaliation claim in *Ikome II* could not have been filed in *Ikome I*. The Court evaluates whether each element of claim preclusion is met before turning to Plaintiff's second argument.

1. Final judgment on the merits in a prior suit.

A final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action. *Pueschel*, 369 F.3d at 355-56 (citing *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398 (1981)). Courts have held that granting a motion for summary judgment constitutes a final judgment on the merits, as does entering judgment following a jury verdict. *See Luther v. Locke*, Case No. 1:09-cv-748, 2010 WL 8913517, at *1 (E.D. Va. Jan. 11, 2010) (holding that the court's decision granting the defendant's motion for summary judgment constituted a final judgment on the merits); *Johnson v. Walmart Stores E., LP*, Case No. 3:14- cv-00235, 2014 WL 3557690, at *3 (W.D.N.C. July 18, 2014) (holding that there was a final judgment on the merits as the jury returned a verdict and the court entered judgment in accordance with that verdict).

Here, this element is easily met. In Plaintiff's earlier suit, the District of Maryland granted summary judgment as to his retaliation and pay claims. *Ikome I*, Dkt. 53. Further, after a trial on Plaintiff's remaining discrimination claim, the jury returned a verdict in favor of CSRA and against Plaintiff, and the district court subsequently issued an Order of Judgment reflecting the jury's

verdict. *Id.*, Dkt. 147. Accordingly, this Court finds that *Ikome I* constituted a final judgment on the merits.

        2. Identity of the cause of action in both the earlier and the later suit.

In evaluating the second prong of the claim preclusion test, courts consider "whether the suits and the claims asserted therein 'arise out of the same transaction or series of transactions or the same core of operative facts.'" *Pueschel v. United States*, 369 F.3d 345, 354 (4th Cir. 2004) (quoting *In re Varat Eters., Inc.*, 81 F.3d 1310, 1316 (4th Cir. 1996)). That inquiry importantly turns on a comparison of the facts in each suit rather than the nature of the claims themselves. *Id.* (explaining that if courts "focus[ed] on the claims asserted in each suit, [they] would allow parties to frustrate the goals of *res judicata* through artful pleading and claim splitting given that '[a] single cause of action can manifest itself into an outpouring of different claims, based variously on federal statutes, state statutes, and the common law'" (quoting *Kale v. Combined Ins. Co. of Am.*, 924 F.2d 1161, 1166 (1st Cir.1991))). Consequently, courts "may take judicial notice of facts from a prior judicial proceeding . . . ." *Andrews v. Daw*, 201 F.3d 521, 524 n.1 (4th Cir. 2000) (citations omitted).

Here, Plaintiff argues that this second element is not met because the only operative fact in common between the two suits is the fact of Plaintiff's termination. Dkt. 20 at 8. Defendant, on the other hand, maintains that both lawsuits revolve around the same two core facts: Plaintiff's replacement by Toliver on the Infrastructure Contract and Plaintiff's ultimate termination. Dkt. Nos. 14-1 at 6-7; 21 at 2. In support of its position, Defendant directs the Court's attention to *Sweeney v. Buttigieg*, No. 21-CV-0204, 2022 WL 1159698, at *1 (E.D. Va. Apr. 18, 2022), *aff'd*, No. 22-1675, 2022 WL 16960911 (4th Cir. Nov. 16, 2022). There, the plaintiff first filed a lawsuit alleging that he had been discriminated against on the basis of his sex when he was denied training

9

and transferred to another facility.  *Sweeney*, 2022 WL 1159698, at *1.  The plaintiff's second lawsuit then alleged that he was denied training and transferred to another facility in retaliation for having filed an administrative complaint.  *Id.*  The court noted that the plaintiff's claim in the second lawsuit "clearly arises from 'the same transaction or series of transactions' and 'the same core of operative facts' as his original lawsuit," as both claims arose from the same termination of his training and the same transfer.  *Id.* at *3.  The only distinction between the two cases was that in the first suit, the plaintiff brought a claim for sex discrimination and in the second he brought a claim for retaliation.  *Id.*  As the district court noted, "a litigant cannot avoid res judicata simply by pleading a 'different theory' by which he could obtain relief on the same set of events."  *Id.* (citing *Harnett v. Billman*, 800 F.2d 1308, 1314 (4th Cir. 1986) ("Claims may arise out of the same transaction or series of transactions even if they involve different harms or different theories or measures of relief.")).

This Court finds *Sweeney* to be instructive here.  As in *Sweeney*, both lawsuits at issue in the instant case revolve around the same set of facts—Plaintiff's replacement by Toliver on the Infrastructure Contract and Plaintiff's ultimate termination by CSRA.  The only difference is that in his first suit, Plaintiff alleged that this course of events was discriminatory and retaliatory in violation of the Montgomery County Human Rights Act, whereas here, Plaintiff alleges that Defendant violated a federal whistleblower statute by retaliating against him after he complained about the "bait and switch" of Program Managers.  Thus, contrary to Plaintiff's assertion that the only operative fact in common between the two suits is the fact of Plaintiff's termination, this Court finds that both suits put at issue the relevant decisionmakers' entire course of conduct leading up to Plaintiff's termination, as such conduct constitutes evidence of CSRA's motivations behind terminating Plaintiff's employment.  Accordingly, because both lawsuits arise out of the

same series of transactions or core of operative facts, the second element of claim preclusion is satisfied.

### 3. Identity of parties or their privies in the two suits.

As to the third prong, the Fourth Circuit has explained that the concept of privity "requires an alignment of interests and not an exact identity of parties," and "centers on the closeness of the relationship in question." *Weinberger v. Tucker*, 510 F.3d 486, 492 (4th Cir. 2007). To be in privity with a party to a former litigation, the non-party must be "so identified in interest with a party to former litigation that he represents precisely the same legal right in respect to the subject matter involved." *Martin v. Am. Bancorporation Ret. Plan*, 407 F.3d 643, 651 (4th Cir. 2005) (quoting *Jones v. S.E.C.*, 115 F.3d 1173, 1180 (4th Cir. 1997)). Courts have generally recognized three categories of non-parties who will be considered in privity with a party to the prior action and who will therefore be bound by a prior adjudication: (1) a non-party who controls the original action; (2) a successor-in-interest to a prior party; and (3) a non-party whose interests were adequately represented by a party to the original action. *Id.* (citing 18A Wright, Miller & Cooper, Fed. Prac. & Proc.: Jur. 2d § 4448 (2d ed. 2002). Courts acknowledge that a successor company is a successor-in-interest after the merger of two companies. *See, e.g.*, *Ayres v. PHH Mortg. Corp.*, Case No. GJH-20-275, 2020 WL 3498158, at *2, *7 (D. Md. June 29, 2020) (finding that the defendant, PHH, was the successor-in-interest to Ocwen, the defendant named in the first lawsuit, after Ocwen merged with PHH).

Here, Defendant General Dynamics is in privity with CSRA, the defendant in Plaintiff's original lawsuit. As Plaintiff acknowledges in his Complaint, General Dynamics purchased CSRA in 2018, and as a result, CSRA was merged into General Dynamics. Dkt. 1 ¶ 48. Thus, because General Dynamics is the successor-in-interest to CSRA and Ikome is the plaintiff in both suits,

11

there is an identity of parties or their privies between the two lawsuits, and the third and final element of claim preclusion is met.

 4. Whether claim preclusion applies even though Plaintiff had not yet exhausted his administrative remedies for his claim in *Ikome II* at the time that he filed suit in *Ikome I*

 Plaintiff asserts that the instant suit is not barred by claim preclusion because he could not have filed the claims at issue here in *Ikome I*, given that, by the time he had exhausted his administrative remedies on the instant whistleblower retaliation claim, discovery had long been closed in *Ikome I* and the court had already entered summary judgment. Dkt. 20 at 11.[4] In support of his argument, Plaintiff encourages this Court to examine district court opinions from the D.C. and Fourth Circuits holding that claim preclusion did not bar the plaintiffs' claims where they had not yet exhausted administrative remedies at the time that the initial lawsuit was filed. *Id.* (citing *Velikonja v. Ashcroft*, 355 F. Supp. 2d 197, 204 (D.D.C. 2005) ("[S]ince plaintiff did not receive a right-to-sue letter . . . until . . . only three days before the close of discovery in [the first action], it would have been utterly impracticable for her to join the new claims in her first action." (internal quotation marks omitted)); *Gaines v. Anderson*, No. 1:17-cv-2755, 2018 WL 1156768, at *6 (D. Md. Mar. 5, 2018) (declining to bar a retaliation claim via *res judicata* where the plaintiff "could not have brought the instant retaliation claim during [the first action] given that she had not yet

---

[4] For this same reason, Plaintiff also contends that the application of claim preclusion here would constitute a "manifest injustice." Dkt. 20 at 9-10 (quoting *Tipler v. E. I. Du Pont de Nemours & Co.*, 443 F.2d 125, 129 (6th Cir. 1971) (opining that claim preclusion may be "qualified or rejected when [its] application would . . . result in manifest injustice")). This Court finds that argument to be unavailing for several reasons. As an initial matter, Plaintiff does not cite to any cases from this jurisdiction (or any other for that matter) in which a court found the standard of "manifest injustice" to be met. Moreover, as explained *infra*, no manifest injustice would ensue from the application of claim preclusion here because Plaintiff's present attempt to relitigate the motivations for his termination results only from his own strategic litigation choices, not from any external forces outside his control.

exhausted her administrative remedies"); *McClary v. Lightsey*, No. 5:16-CT-3052-BO, 2018 WL 9849553, at *4 (E.D.N.C. June 20, 2018), *aff'd*, No. 19-6901, 2019 WL 5787984 (4th Cir. Nov. 6, 2019) ("If the claims were not exhausted, they could not have been raised in [the first litigation], and would not be barred by the doctrine of *res judicata*."); *Conrad v. Amp, Inc.*, No. C-78-234-G, 1979 WL 54, at *1 (M.D.N.C. Aug. 17, 1979) (declining to apply claim preclusion to bar Title VII claim where "the plaintiff assert[ed] that she did not receive her right to sue letter" until after filing her first suit, and therefore "no state or federal court would have had jurisdiction over her Title VII claims when she brought" her first suit)).

Defendant counters that the facts at hand readily distinguish this case from several of Plaintiff's cited authorities, in which the plaintiffs timely sought administrative relief with respect to the claims in the second suit. Dkt. 21 at 6. This Court agrees that the cases Plaintiff relies on are inapposite. In those cases, the timing of the administrative process, not the plaintiffs' own strategic litigation choices, precluded the plaintiffs from raising a claim in the initial litigation. *See Velikonja*, 355 F. Supp. 2d at 204 (emphasizing that the "plaintiff was prudent in seeking administrative relief relating to the [relevant] events"); *Gaines*, 2018 WL 1156768, at *7 ("About a month after she was terminated, Gaines filed a separate, Second Charge alleging that she was terminated in violation of Title VII.").[5] By contrast, in the case at bar, Plaintiff did not even initiate the administrative process by filing a whistleblower complaint with the OIG until August 13,

---

[5] This Court acknowledges that in one case that Plaintiff cites, *McClary v. Lightsey*, No. 5:16-CT-3052-BO, 2018 WL 9849553, at *4 (E.D.N.C. June 20, 2018), the district court was without information as to whether and when plaintiff initiated administrative process as to the claim in the second suit. And in another case that Plaintiff cites, *Conrad v. Amp, Inc.*, No. C-78-234-G, 1979 WL 54 (M.D.N.C. Aug. 17, 1979), the district court did not mention when the plaintiff initiated the administrative process as to the claim in the second suit. However, unlike in the instant case, there were no facts in either of those two cases to suggest that the plaintiffs had delayed initiating the administrative process for strategic purposes.

2019—774 days after his termination and 680 days after he filed the initial lawsuit but only 25 days after Defendant had won summary judgment as to two of Plaintiff's claims in *Ikome I*. *See* Dkt. 1 ¶ 3 (OIG complaint filed on August 13, 2019); *id.* ¶ 46 (Plaintiff's employment terminated on June 30, 2017); *Ikome I*, Dkt. 2 at 1 (*Ikome I* Complaint filed on October 2, 2017); *Ikome I*, Dkt. 53 (*Ikome I* summary judgment opinion issued on July 19, 2019). Moreover, Plaintiff actually *extended* the administrative process by agreeing to a request by the OIG to extend the 180-day deadline for the OIG to complete its investigation and submit a report of its findings by an additional 180 days. Dkt. 1 ¶ 4.

Further, several of our sister circuits have held that claim preclusion still controls when a claim requires exhaustion of administrative remedies but, at the time of the earlier suit, the plaintiff had not yet received a right to sue letter. *See Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 316 (5th Cir. 2004) (claims in second lawsuit not exempt from claim preclusion where plaintiffs could have requested a stay in initial case until they received their right to sue letters); *Heyliger v. State Univ. & Cmty. Coll. Sys. of Tenn.*, 126 F.3d 849, 855-56 (6th Cir. 1997) (subsequent claim not precluded where plaintiff could have, but did not, request a right to sue letter before a judgment in the initial suit was issued); *Herrmann v. Cencom Cable Assocs., Inc.*, 999 F.2d 223, 225 (7th Cir. 1993) (explaining that a plaintiff in such a situation has options he can pursue to preserve his rights for all causes of action: he may ask the administrative agency to accelerate the administrative process, or he may sue on his other claims and ask the court to stay the proceedings until the administrative process is complete); *Woods v. Dunlop Tire Corp.*, 972 F.2d 36 (2d Cir.1992)

(holding that plaintiff's Title VII claims were barred by claim preclusion even though she had not received a right to sue letter at the time she filed the initial lawsuit).[6]

Indeed, the Sixth Circuit's opinion in *Heyliger* serves as a useful reference to this matter. There, the plaintiff could have requested a right to sue letter approximately three years before the judgment was entered in the first case but failed to do so until after losing that case. 126 F.3d at 855-56. Similarly, in the instant case, Plaintiff failed to even initiate the administrative process until after an unfavorable summary judgment ruling. Thus, given Plaintiff's lack of diligence, his failure to administratively exhaust his whistleblower retaliation claim does not bar the application of claim preclusion, just as the court held in *Heyliger*. Any other result would incentivize plaintiffs to delay initiating the administrative exhaustion process, thereby defeating the purposes of claim preclusion: "[j]udicial efficiency and finality" of decisions. *In re Microsoft Corp. Antitrust Litig.*, 355 F.3d at 325. Accordingly, because all three elements of claim preclusion are met and the lack of exhaustion of administrative remedies does not bar the application of the doctrine, Plaintiff's Section 4712 retaliation claim is subject to claim preclusion and is thus dismissed.

---

[6] Several courts within the Fourth Circuit have followed suit. *See Hall v. St. Mary's Seminary & University*, 608 F. Supp. 2d 679, 687-88 (D. Md. 2009) (favorably citing the Seventh Circuit's view in *Herrmann v. Cencom Cable Assocs., Inc.*, 999 F.2d 223 (7th Cir. 1993) and finding that "with proper planning" the plaintiff could have pursued all of her claims in one suit and was not entitled to "another bite of the apple"); *Sanders v. Tyco Elec. Corp.*, 235 F.R.D. 315, 321-22 (W.D.N.C. 2006) (relying on *Davis v. Dallas Area Rapid Transit*, 383 F.3d 309, 315-16 (5th Cir. 2004) in concluding that the plaintiff could not bring a second action even though she had not exhausted her administrative remedies when the first action was filed).

## IV.  CONCLUSION

For the foregoing reasons, it is hereby ORDERED that Defendant's Motion to Dismiss (Dkt. 14) is GRANTED.  The instant action is barred by the doctrine of claim preclusion and Plaintiff's Complaint (Dkt. 1) is therefore DISMISSED WITH PREJUDICE.

It is SO ORDERED.

Alexandria, Virginia
June 7, 2023

/s/
Rossie D. Alston, Jr.
United States District Judge